IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KATRINA EVANS, | ) | 4:08CV3266 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

The Social Security Administration (SSA) has determined that Katrina Evans (Evans), although suffering from relapsing-remitting multiple sclerosis (MS) and an adjustment disorder, is not disabled. Evans complains that the SSA's decision to deny her disability insurance benefits is contrary to law and not supported by the evidence because the administrative law judge who heard her case (1) summarily rejected the opinion of a nurse practitioner who treated Evans for over three years and (2) failed to consider observations made by Evans' mother and a SSA employee concerning her physical and mental condition.

After careful review of the administrative record, I find and conclude that the SSA's decision to deny benefits should be reversed, and the case remanded for further proceedings, because the ALJ did not adequately explain his rejection of the nurse practitioner's opinion.

## I.  Procedural Background

Evans filed an application for benefits under Title II of the Social Security Act on May 3, 2005, claiming she became disabled on December 21, 2004. (Transcript (Tr.) 60-62) Her application was denied initially on August 11, 2005, and on reconsideration on February 1, 2008. (Tr. 24-25, 48-59) Evans requested a hearing by an administrative law judge (ALJ), which was held by video teleconference on

June 17, 2008. (Tr. 26-47) Testimony was provided by Evans, who was represented by counsel, and by a vocational expert called by the ALJ. (Tr. 343-380)

On July 17, 2008, the ALJ issued an adverse decision finding that Evans was not disabled as defined in the Act at any time between the alleged disability onset date and March 31, 2008, the last date when she met the earnings requirements for insured status under the Act. (Tr. 13-23) On October 31, 2008, the Appeals Council of the Social Security Administration denied Evans' request for review. (Tr. 5-12) Thus, the decision of the ALJ stands as the final decision of the Commissioner and is subject to judicial review under 42 U.S.C. § 405(g).

## II.  The ALJ's Decision

In his decision, the ALJ evaluated Evans' claim according to the five-step sequential analysis prescribed by the Social Security Regulations.[1] *See* 20 C.F.R. § 404.1520. Among other things, the ALJ found that:

---

[1] The five steps were summarized by the Court of Appeals in *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006), as follows:

At the first step, the claimant must establish that she has not engaged in substantial gainful activity. The second step requires that the claimant prove she has a severe impairment that significantly limits her physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that her impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove she lacks the residual functional capacity to perform her past relevant work. Finally, if the claimant establishes that she cannot perform her past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

2

1.  Evans did not engage in substantial gainful activity from December 21, 2004, through March 31, 2008. (Tr. 18)

2.  Through the last date insured, Evans had severe impairments consisting of relapsing and remitting multiple sclerosis and an adjustment disorder.[2] (Tr. 18)

3.  Evans did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 18)

4.  Through the date last insured, Evans "had the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), that precludes: lifting and carrying more than 20 pounds occasionally or 10 pounds frequently; standing, walking, or sitting for more than about six hours of an 8-hour workday; more than occasional climbing of ramps and stairs; all climbing of ladders, ropes and scaffolding; and that avoids exposure to temperature extremes, dangerous moving, machinery and unprotected heights. Additionally, the claimant is limited to simple and repetitive tasks, but retains the ability to maintain persistence and pace and maintain attention and concentration to perform simple and repetitive tasks, adapt to unusual changes in a workplace setting, adhere to workplace safety rules, and to relate and interact appropriately with coworkers, supervisors and the general public. (Tr. 19-20) With such a residual functional capacity (RFC), Evans was unable to perform any of her past relevant work, which included semiskilled labor as a sales assistant, fast foods assistant manager and buser. (Tr. 22)

---

[2] A medically determinable impairment is "severe" if it significantly limits an individual's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1521.

5. Considering Evans' age (33 when last insured), education (high school), work experience, and RFC, there were other jobs that existed in significant numbers in the national and regional economy that she could perform, including bagger, garment sorter and grader. (Tr. 22-23) Consequently, Evans was not under a disability at any time between December 21, 2004, and March 31, 2008. (Tr. 23)

### III.  The Record and Proceedings Before the ALJ

Beginning on August 28, 2002, Evans presented intermittently to a nurse practitioner, Janet Duba, RN, APRN, for treatment of depression and anxiety. (Tr. 179-95, 235-37)

On September 24, 2002, Evans reported that since her last visit (for which there are no treatment notes), her mood had improved, and she had not had any panic attacks. Her depression was rated at 7 on a 10-point scale (with 10 being happiest) and her anxiety level was rated at 7 or 8 on a 10-point scale (with 10 being the least anxious).  Evans' Xanax prescription was adjusted and she was directed to return in one month. (Tr. 195)

The next treatment record with Ms. Duba is dated March 13, 2003.  Evans reported that she was still not happy, but her anxiety was better.  She complained of mood swings and indicated that her father is bipolar.  Evans stated she was not ready to quit the Xanax.  Her thought process was goal directed and logical, and she exhibited fair insight and judgment. Ms. Duba's notes indicate that Evans' depression ranged between 1 and 9 on a 10-point scale.  Her overall assessment was that Evans' condition had worsened. Ms. Duba diagnosed Evans with Bipolar NOS (probably type II) and prescribed an antipsychotic medication, Abilify. Evans was directed to return in two to four weeks. (Tr. 193)

4

Evans telephoned Ms. Duba on March 27, 2003, and reported that she really liked the Abilify but felt she needed to increase her antidepressant (Paxil) dosage, which Ms. Duba authorized. Evans stated that she was sleeping well and having minimal mood swings, but was starting to be afraid of the dark and have other anxieties. (Tr. 192)

Ms. Duba's progress notes for September 29, 2003, indicate that she had not seen Evans for a long time. Evans reported that she was doing "ok" and was a foster parent. She stopped taking the Abilify because it made her more anxious. She had not had any panic attacks. Her insight and judgment were good. Her depression scale rating was 8 or 9 (with 10 being happiest). Ms. Duba's overall assessment was that Evans had achieved the goals of her treatment plan. She instructed Evans to return in two to three months. (Tr. 191)

The next progress notes are dated March 30, 2004. Evan again reported that she had not had any panic attacks and stated she was sleeping well. Ms. Duba noted that Evans' condition was unchanged. She was told to return in six months. (Tr. 190)

On September 13, 2004, Evans reported that she was sleeping "ok," her anxiety was "ok," and she was not depressed. She was taking a muscle relaxer for headaches. Evans indicated she had a 16-year-old foster child and was also babysitting. Her depression and anxiety were both rated at 8 on a 10-point scale (with 10 being happiest, least anxious), and Ms. Duba again noted that the treatment plan goals were achieved. A return visit was scheduled for six months later. (Tr. 189)

On March 3, 2005, Evans presented to Rebecca Steinke, M.D., complaining of double vision in her left eye and left-sided weakness. (Tr. 125) Dr. Steinke ordered magnetic resonance imaging (MRI) of the brain. (Tr. 233) Evans' MRI showed two questionable white matter lesions in the supratentorium white matter, suggesting possible MS. (Tr. 132)

5

Evans saw a neurologist, Ahmed Sadek, M.D., on March 4, 2005. She complained of numbness in the left leg, left periorbital pains, blurred vision, and double vision. Evans reported that she initially noticed symptoms one to two months prior when she suddenly noticed a tingling and numbness in her left thigh. (Tr. 206-208) Evans also had an MRI of the neck and face, which showed no signal abnormalities within the optic nerves. (Tr. 133) Dr. Sadek noted that Evans' symptoms were consistent with MS, relapsing and remitting type, but also noted that her MRI findings were "very subtle." Dr. Sadek diagnosed possible MS (in exacerbation). (Tr. 207-208)

On March 3, 2005, Evans presented to Michele Gleason, M.D., complaining of blurry and double vision. Dr. Gleason diagnosed diplopia and lateral rectus weakness in the left eye. (Tr. 213)

On March 22, 2005, Evans returned to Ms. Duba and stated that she was experiencing feelings of anger over her diagnosis of MS but was trying to accept it. Ms. Duba noted that Evans' condition had worsened, but her diagnosis was unchanged and "situational." (Tr. 188)

Evans returned to Dr. Gleason on April 6, 2005, complaining of eye pain and diplopia. Dr. Gleason noted no obvious deficit in vision. (Tr. 212)

On April 19, 2005, Evans reported to Ms. Duba she was discouraged and feeling "useless."  She stated she was unable to do daycare because of the physical demands and stress.  She had a pronounced limp.  Ms. Duba's overall assessment of Evans' mental condition was that there had been no change from the last visit.  She prescribed Paxil and Remeron, an antidepressant. (Tr. 187)

Dr. Sadek diagnosed Evans with MS, relapsing remitting type, on April 21, 2005. Evans' symptoms included depression, forgetfulness, occasional headaches, weight loss, numbness and excessive sweats. She also reported pain in her arms, legs,

6

feet, and hands, poor appetite, nausea, stomach pains, blurred vision, double vision, vision flashes and halos, and hot flashes. At that time, her medication included Premarin, Xanax, Paxil CR, Skelaxin and Darvocet. Dr. Sadek informed Evans that she should begin physical therapy to improve the weakness in her lower extremities and start on a medication to help curb the MS; Evans chose Avonex. (Tr. 203-204)

On April 27, 2005, Evans followed up with Dr. Gleason. She reported some improvement in diplopia symptoms. (Tr. 211)

On May 11, 2005, after Evans had submitted her application for benefits, she was interviewed face-to-face by a SSA employee, D. Beed, who observed that Evans had difficulty walking and seeing, and stated that she "has double vision so reading was difficult, walking was slow, drags left leg." (Tr. 70)

Evans presented to Ms. Duba on May 17, 2005, and reported an improvement in her physical symptoms after taking Avonex. Evans stopped taking Paxil but continued on Remeron. She stated that physical therapy was helping her walk.  She was having problems with balance, numbness, and fine motor skills. Ms. Duba noted an improvement in Evans' mood and attitude.  Her insight and judgment were fair to good.  Her depression and anxiety were both rated at 6 on a 10-point scale (with 10 being happiest, least anxious). (Tr. 186)

Evans' mother, Mary K. Lathrop, completed a supplemental information form on May 25, 2005. Among other things, Mrs. Lathrop stated that  Evans  needed a 30 minute rest break to help her in a stressful situation. She also stated that Evans had limited concentration and problems with short term memory loss. (Tr. 97-99)

On May 26, 2005, Evans reported increased anxiety to Ms. Duba and started taking Paxil again. She was to continue taking Remeron. (Tr. 185)

Evans returned to Dr. Sadek on June 23, 2005. Dr. Sadek noted Evans was currently using Avonex for disease control. The doctor recommended she continue the current dose of Avonex and advised her to use Amantadine for fatigue and to continue Paxil and Xanax for the treatment of depression and anxiety respectively. (Tr. 202)

On July 12, 2005, Ms. Duba noted that Evans had stopped taking Remeron and was now taking only Paxil. Evans reported an improvement in sleep and stated she was adjusting to her diagnosis of MS. She was walking better and her vision was better. Ms. Duba's overall assessment was that Evans' condition had improved. Her depression was rated at 7 on a 10-point scale (with 10 being happiest). (Tr. 184)

Evans returned to Dr. Gleason on July 26, 2005. Evans complained of continued diplopia and pain around the eye triggered by bright light. (Tr. 210)

On July 28, 2005, Evans presented to Alan J. Smith, Ph.D., for a consultative psychological examination. (Tr. 143-155) Dr. Smith administered the Wechsler Memory Scale III, which revealed obtained scores within the superior to very superior range across primary indices. (Tr. 148) He noted Evans' memory skills were "most excellent," with some mild disturbance in working memory skills. (Tr. 149) Mental status evaluation and standardized memory testing did not detect any disturbance of cognitive functioning. (Tr. 149) Dr. Smith diagnosed Evans with adjustment disorder with mixed anxiety and depressed mood, and assigned Evans a global assessment of functioning (GAF) score of 54.[3] (Tr. 149) Dr. Smith opined that Evans' psychological examination did not reveal cognitive, emotional, or behavioral problems that would

---

[3] The *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (DSM-IV-TR) states that the GAF scale is used to report the clinician's opinion as to an individual's level of functioning with regard to psychological, social, and occupational functioning. *See* DSM-IV-TR 34 (4th ed. 2000). A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

interfere with her ability to perform work in any setting. (Tr. 149-150) He noted that her symptoms of anxiety and depression would likely become exacerbated as her MS progresses. (Tr. 150) Dr. Smith indicated that his examination did not show any restriction of Evans' activities of daily living or any difficulties in her maintaining social functioning.  He also indicated that Evans was able to sustain concentration and attention needed for task completion, to understand and remember simple instructions, to carry out short and simple instructions under ordinary supervision, to relate appropriately to co-workers and supervisors, and to adapt to changes in her environment. (Tr. 155)

Linda Schmechel, Ph.D., a state agency psychological consultant, reviewed Dr. Smith's report and completed a psychiatric review technique form on August 11, 2005.  She noted that Evans' WMS-R scores were in the very high and superior range, and that her working memory scores were in the average range, suggesting "mild" difficulties with her working memory skills.  This was thought to be secondary to a mood disorder.  Dr. Schmechel opined that Evans' mental impairment was "currently nonsevere." (Tr. 177) She indicated that Evans' activities of daily living were only mildly restricted, and that Evans also had only mild difficulties in maintaining social functioning and in maintaining concentration, persistence, and pace. (Tr. 175)

A state agency medical consultant, Jerry Reed, M.D., opined on August 11, 2005, that Evans' treatment regime was controlling most of her MS symptoms. He noted that while Evans may feel fatigue and intermittent weakness, the records did not support Evans' reports of constant problems with balance and extreme difficulties in using her hands. He stated that objective findings showed Evans had no problems with fine motor movements and coordination. (Tr. 164) Dr. Reed completed a physical RFC assessment, finding that Evans could lift and carry a maximum of 20 pounds occasionally or 10 pounds frequently; stand, walk, or sit for a total of 6 hours of an 8-hour workday; and occasionally climb stairs but never climb ladders, ropes, and scaffolds.  (Tr. 157-158) Dr. Reed found no manipulative or visual limitations.

9

(Tr. 159) He indicated that Evans should avoid concentrated exposure to temperature extremes and to hazardous machinery. (Tr. 160)

On September 26, 2005, Ms. Duba documented that Evans was "not doing well." She noted Evans was just taken off steroids and her MS symptoms "moved to the opposite side." Ms. Duba specifically noted that Evans "needs hope" and referred her to the University of Nebraska Medical Center (UNMC). Evans was restarted on Remeron. (Tr. 180, 183)

On September 29, 2005, Evans had a followup visit with Dr. Sadek, who noted that Evans' MS symptoms continued despite taking Avonex. She recently completed five days of Solu-Medrol (steroid) infusions for treatment of her MS symptoms. Evans complained of having right leg numbness and mild weakness for the past three weeks, but her leg numbness was improving. She also complained of experiencing right upper extremity pain and numbness and visual obscurations over the past two months. Evans stated that she felt fatigued "all the time" and complained about worsening depression. Dr. Sadek recommended Evans switch from Avonex to Copaxone. (Tr. 198-200)

The 5-day regimen of Solu-Medrol infusions was repeated beginning on November 14, 2005, and again beginning on February 15, 2006. (Tr. 329-334)

On March 9, 2006, Evans was admitted to the emergency room at Saint Francis Medical Center after attempting suicide by cutting her wrist. (Tr. 299) She was put under emergency protective custody and transported to Mary Lanning Memorial Hospital. (Tr. 278, 300) Dan Bizzell, Ph.D., examined Evans and opined that she met the criteria for being considered both "mentally ill" and "dangerous." Dr. Bizzell diagnosed Evans with depression secondary to her MS, and assigned her a GAF score

of 20-25.[4] Dr. Bizzell recommended Evans be committed for inpatient psychiatric stabilization followed by outpatient psychiatric medication management and therapy. (Tr. 277) For the next five days, Evans remained in the hospital. (Tr. 260-269) Carole Sandeen, a licensed mental health practitioner (LMHP), interviewed Evans and noted that she readily shared her concerns regarding MS and depression that she was experiencing. Evans demonstrated good insight and fair judgment and expressed regret regarding the suicide attempt. (Tr. 267) Virginia Aguilar-Sincaban, M.D., examined Evans prior to discharge and prescribed an increased dose of Paxil CR and a reduced dose of Xanax. Dr. Aguilar-Sincaban diagnosed Evans with mood disorder secondary to MS with severe depression and anxiety, and assigned her a GAF score of 61.[5] Evans was discharged on March 14, 2006. (Tr. 260-263)

In July 2006, Evans reported pain in her hips, and Dr. Sadek ordered x-rays and a bone scan. (Tr. 290, 292) X-rays taken on July 10, 2006, showed normal bones and soft tissues. There was no evidence of fracture or other abnormality (Tr. 293) A bone scan taken on July 18, 2006, showed no evidence of occult fracture. Evans' hips were symmetric bilaterally. (Tr. 291)

On August 22, 2006, Ms. Duba completed a Medical Source Statement-Mental (MSS-M), and indicated that Evans had a Axis I diagnosis of panic disorder and Type II bipolar disorder.  She stated that Evans "does fairly well when on meds" but that she "doesn't like to take medicine so periodically stops, changes etc." Her prognosis was poor.  Ms. Duba found Evans was moderately limited in the ability to remember locations and work-like procedures; carry out detailed instructions; interact

---

[4]A GAF score of 21-30 indicates behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment, or an inability to function in almost all areas. *See* DSM-IV-TR 34.

[5]A GAF score of 61 to 70 indicates the patient has some mild symptoms or some difficult in social, occupational, or social functioning, but is generally functioning pretty well and has some meaningful interpersonal relationships. *See* DSM-IV-TR 34.

appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. She also opined that Evans was markedly limited in the ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and travel in unfamiliar places or use public transportation. Ms. Duba thought Evans was not significantly limited in the ability to understand, remember, and carry out very short and simple instructions; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Ms. Duba noted Evans experienced good and bad days and because of the bad days, she would miss more than four days of work per month.  In describing why her patient would have difficulty working at a regular job on a sustained basis, Ms. Duba stated that Evans would have "much difficulty anyway," but with the diagnosis of MS her coping skills and reasoning became "even worse."  Ms. Duba stated that the last time she saw Evans she referred her to the UNMC MS clinic because she was suffering from fatigue and having trouble walking, and was more depressed.  (Tr.181-183)

On September 12, 2006, Evans reported to Central Nebraska Orthopedics, complaining of right hip pain. The treating physician noted that the MS had caused abductor weakness and secondary trochanteric bursitis, and recommended that Evans try outpatient physical therapy to relieve her symptoms. (Tr. 239)

Dr. Sadek referred Evans to the Multiple Sclerosis Clinic at The Nebraska Medical Center. (Tr. 258-259) On December 11, 2006, Pierre Fayad, M.D., examined

12

Evans and observed that she had mild ataxia and a slightly unsteady gait, but otherwise subtle deficits. Dr. Fayad noted that steroids and Avonex had contributed to Evans' depression symptoms and suicide attempt. Evans tolerated Copaxone but continued to have MS attacks. Dr. Fayad recommended that Evans begin a course of Tysabri to treat her MS. (Tr. 258-259)

Evans had an MRI of the brain on February 1, 2007. The MRI showed white matter lesions consistent with MS, but was otherwise normal. (Tr. 251)

Evans received her third dose of Tysabri on April 5, 2007, and was reportedly "doing well," with no side effects and no problems. Evans felt an improvement in her symptoms of fatigue after taking Tysabri. (Tr. 249)

On July 5, 2007, Evans received her sixth dose of Tysabri. She continued to experience some "mild" baseline MS symptoms, including mild aching behind the left eye, some sensitivity in the right arm, and some numbness and tingling in her feet. However, Kathleen Healey, APRN, noted that Evans reported no clear event suggestive of a relapse. (Tr. 247)

On August 8, 2007, Evans presented to Dr. Gleason, complaining of eye pain and continued diplopia. (Tr. 218) In a letter dated August 9, 2007, Dr. Gleason reported that Evans was diagnosed with MS with a history of optic neuritis and internuclear ophthalmoplegia, but currently, Evans did not appear to have any active optic neuritis. (Tr. 216)

On August 29, 2007, Ms. Duba completed a mental status examination. The exam was normal. Evans' mood was good, and her insight and judgment were also good.  Evan reported that her "M.S. is much better!"[6]  She was "going to UNMC and

---

[6] The Commissioner interprets "M.S." to mean "mental status."  (Filing 28, at 8, 18) A more reasonable interpretation is "multiple sclerosis," since this is what

. . . almost feeling like she use[d] to." She had no suicidal ideation, but told Ms. Duba she had attempted suicide in March 2005 after being on a high dosage of steroids. Evans was given a GAF of 55; her diagnoses included major depression recurrent and panic disorder.(Tr. 236)

Evans received her tenth dose of Tysabri in October 2007. Ms. Healey noted that Evans continued to experience mild baseline symptoms but was tolerating the treatment well. (Tr. 245) Two months later, Evans returned for another dose of Tysabri and mitoxantrone and appeared to be "doing quite well" without clear relapse or medical worsening. (Tr. 242)

On December 27, 2007, Evans had another MRI of the brain. The MRI showed the white matter lesions and left superior cerebellum were unchanged. (Tr. 244)

On February 11, 2008, Evans spoke to Ms. Healey on the phone and complained of a sharp, shooting pain to the left side of her jaw and cheek. Ms. Healey noted that Evans' symptoms suggested a relapse and assessed trigeminal neuralgia. Ms. Healey prescribed an increased dose of Neurontin as well as Advil. (Tr. 241)

On February 14, 2008, Evans had an MRI of the brain which showed stable stigmata of MS and probable acute inflammatory fluid in the right maxillary sinus. (Tr. 240)

On February 26, 2008, Evans returned to Ms. Duba and reported that she was seeking disability. Ms. Duba noted that Evans and her husband were separating, and Evans planned to move to Omaha to be near her family. Evans was also raising her 10-year-old niece. Ms. Duba's overall assessment was that Evans' condition had improved.  Her depression scale rating was 6 (with 10 being happiest). (Tr. 235)

---

Evans was being treated for at UNMC.  This interpretation is also consistent with Ms. Duba's Axis III diagnosis of "M.S." in the same document.  (Tr. 236)

At the June 17, 2008, hearing, Evans testified that her symptoms included optic neuritis in the left eye, blurred vision and pain, numbness in her right leg, problems walking, trigeminal neuralgia in her face, fatigue, depression, and anxiety. (Tr. 350) She was able to drive and could see normally when looking straight ahead. (Tr. 353) Evans' activities of daily living included showering, grocery shopping, and doing the dishes and laundry. (Tr. 354-355, 361) With respect to her mental impairments, Evans testified that she was depressed, had suicidal thoughts, and isolated herself. (Tr. 357) She reported no problems with sleep, but had difficulties with memory and concentration. (Tr. 359, 361) With respect to her physical impairments, Evans testified that she was able to walk from the parking lot to the grocery store. (Tr. 364) She stated she could sit for 45 minutes at one time, lift and carry 25 pounds, stand for 30 minutes at one time, and walk for 20 minutes at one time. (Tr. 367) Evans testified that she experienced two to three MS "attacks" per year, each lasting approximately six weeks. (Tr. 368) Evans stated that her medications were "very helpful" in controlling her mental and physical symptoms. (Tr. 368) The only side effect she experienced was some fatigue from antidepressants. (Tr. 368)

### IV. Analysis

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. *Hogan v. Apfel*, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Id.*, at 960-61; *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. *Smith v.*

*Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo. *Olson ex rel. Estate of Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n.2 (8th Cir. 1995); *Smith*, 982 F.2d at 311.

### A.  Nurse Practitioner's Opinion

The ALJ gave no weight to the medical source statement that Janet Duba completed on August 22, 2006, because she was not an "acceptable medical source" and her opinion was not consistent with the opinions of Dr. Smith and Dr. Schmechel. The ALJ explained:

> A registered nurse (RN) "diagnosed" the claimant with a panic disorder and bipolar disorder and then proceeded to opine about the claimant having multiple moderate and marked limitations in specific functional abilities (Exhibit 5F, pp. 3-5 [Tr. 181-183]). Disability can only be found as a result of a medically determinable impairment (20 CFR 404.1505). The impairment must result from abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques (20 CFR 404.1508). As evidence concerning a medically determinable impairment, the Social Security Administration needs reports from acceptable medical sources (20 CFR 404.1513). A nurse practitioner is not an acceptable medical source (*Ibid.*). A nurse practitioner's opinion about the claimant's condition is not a medical opinion that can reflect judgment on the nature and severity of an impairment, or provide a diagnosis or prognosis (20 CFR 404.1527). The opinion of the nurse practitioner is inconsistent with the opinions of the psychological consultative examiner and the State Agency psychological consultant, who are acceptable medical sources (Exhibit 2F, pp. 7-8 [Tr. 149-150]; Exhibit 4F, p. 1 [Tr. 165]; 20 CFR 404.1513). Therefore, I reject the conclusions of the nurse practitioner.

(Tr. 21)

Under the Social Security regulations, nurse practitioners are not considered "acceptable medical sources" who can provide evidence to establish the existence of

16

a medically determinable impairment, *see* 20 C.F.R. §§ 404.1513(a),[7] but as "other medical sources" their opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, *3 (Aug. 9, 2006). "Opinions from 'other medical sources' may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *5.

Factors for considering opinion evidence from "other sources" (both medical and non-medical) include (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. *See id.* at *4-5. "Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6. However, an arguable deficiency in the ALJ's opinion-writing technique does not require the court to set aside an administrative finding when that deficiency had no bearing on the outcome. *See Owen v. Astrue*, 551 F.3d 792, 801 (8th Cir. 2008).

---

[7] Also, only "acceptable medical sources" can provide medical opinions or be considered "treating sources" whose opinions may be entitled to controlling weight. *See* 20 C.F.R. §§ 404.1502 and 404.1527(a)(2) & (d). A nurse practitioner who works with an acceptable medical source under a team approach may be considered a treating source, *see Shontos v. Barnhart*, 328 F.3d 418, 421 (8th Cir. 2003), but there is no evidence Ms. Duba was teamed with an acceptable medical source.

Even though the ALJ states that he "considered opinion evidence in accordance with the requirements of SSRs 96-2p, 96-5p, 96-6p and 06-03p" (Tr. 20), it is not apparent that he gave proper consideration to the various weighting factors listed in Social Security Ruling 06-03p.  The ALJ correctly determined that Ms. Duba's diagnosis of Evans' mental impairment was entitled to no weight because she is not an acceptable medical source, but this determination did not allow him to disregard Ms. Duba's observations about Evans' symptoms of anxiety and depression or to reject out of hand her opinion regarding the severity of Evans' functional limitations. The Commissioner in his brief has endeavored to provide a *post hoc* rationale for discrediting Ms. Duba's opinion by pointing out inconsistencies in the record, but my review is concerned with what the ALJ actually considered. Since none of the nurse practitioner's treatment notes are even mentioned in the ALJ's decision, I am unable to conclude that he considered anything other than the fact that Ms. Duba's opinion did not match the opinions of Dr. Smith and Dr. Schmechel.[8]

### B.  Lay Persons' Observations

The ALJ's decision also contains no mention of the observations made by a SSA employer during a face-to-face interview with Evans on May 11, 2005, or the information that was provided by Evans' mother two weeks later.  I find that neither omission was consequential.

The SSA employee observed that Evans "has double vision so reading was difficult, [her] walking was slow, [and she] drags [her] left leg." (Tr. 70) While the

---

[8] I also note that Ms. Duba completed the MSS-M form more than one year after the consulting psychologists rendered their opinions, and about three months after Evans was hospitalized because of a suicide attempt.  Dr. Smith had examined Evans just a few months after she was diagnosed with MS, and concluded she was suffering from an adjustment disorder as a result of this stressor.  He indicated that Evans' symptoms of anxiety and depression would likely become exacerbated as her MS progressed. (Tr. 150)

ALJ did not specifically discuss this notation, Evans' problems with double vision and leg numbness were recognized in the decision.  The ALJ stated:

> The claimant's testimony reflects that she has constant numbness and diminished or altered sensation on the right side.[9]  However, she admitted she is able to engage in a wide range of activities of daily living such as shopping and cleaning her home, which demonstrates she is able to function and accommodate her numbness and altered sensation on her right side. She testified that she has optical neuritis in her left eye and that she gets some double vision when she looks off to the side using her peripheral vision.  However, she admitted that she can see normally in front of her and that she sees well enough to read and drive an automobile.

(Tr. 20) The ALJ concluded that "[t]he claimant's testimony is generally consistent with the objective medical evidence in the record that indicates she has such symptoms from multiple sclerosis."  (Tr. 20)

In a physical RFC assessment prepared by Dr. Reed on August 11, 2005, the following comments were made regarding his review of Evans' medical records:

> The claimant started having some back pain and leg numbness after a fall and some blurry vision in recent months.  MRI's and CAT scans showed some very subtle lesions possibly due to MS – thought to be probable MS plaques.  A [cerebrospinal fluid (CSF) analysis] confirmed this diagnosis.  By 4/27/05, her eye exam showed that her blurry vision was no longer bothering her since she had started treatment.

> 4/21/05 – [followup (fwup)] – the C[laimant] reported having pain in all four of her extremities and [headache (HA)] on examination with some blurry vision. [Physical examination (PE)] – mild double vision on left gaze, muscle, bulk, tone strength – all [within normal limits (WNL)]

---

[9] Although the SSA employee noted that Evans was dragging her left leg on May 11, 2005, Evans later complained primarily of right-sided numbness.

and 5/5.  Minimal weakness noted in [left lower extremity (LLE)].
Finger to nose movements and walking was WNL. [Diagnosis (Dx)] –
Relapsing & Remitting MS.  Plan – to start [physical therapy (PT)] and
start on Avonex.

6/23/05 – C reports that her symptoms have gradually improved
and she currently has no complaints of double vision and no weakness
in her lower extremities.  Pain reported as 0/10.  PE normal except for
some exaggerated [deep tendon relexes (DTR's)] (without clonus).
Intact finger to nose and heel to shin. Gait within normal limits.  C is
able to tandem walk, heel walk and toe walk.  Sensory was normal,
strength 5/5.  C will continue Avonex and return 3-4 months.

(Tr. 164) This information confirms that Evans was experiencing some double vision
and weakness in her lower left extremity as of April 21, 2005 – about 3 weeks before
the interview with the SSA employee – but also shows that these symptoms were
gone by June 23, 2005, following treatment for her MS.

Evans' mother reported in an unsworn statement on May 25, 2005, that "[i]n
stressful situation[s] when she is tired she becomes anxious, irritable, [and] requires
a rest period (30 minutes or so) to recover."  (Tr. 98) Ms. Lathrop also stated that her
daughter's "concentration can be limited by problems with short term memory, which
is fair to poor [at] this time."  (Tr. 99)

Although the ALJ failed to discuss these statements, he did acknowledge that
Evans experiences depression and fatigue, and that she may have a difficulties
concentrating.  He stated:

It is clear that the claimant has some mild limitations from her
symptoms of depression related to her diagnosed adjustment disorder.
She would also likely have some difficulty concentrating sufficiently to
perform complex or detailed tasks secondary to her fatigue.  I find the
record as a whole justifies finding the claimant precluded from
performing complex and detailed work and is limited to performing
simple and repetitive tasks.

(Tr. 21) The ALJ also determined Evans has "moderate difficulties in maintaining concentration, persistence, or pace." [10] (Tr. 19) This is generally consistent with the observations made by Evans' mother. While the ALJ was remiss in failing to discuss Ms. Lathrop's statements, *see Willcockson v. Astrue, 540 F.3d 878, 880-81 (8th Cir. 2008)* (ALJ's failure to reference statements from claimant's relatives supported remand), I conclude this was harmless error.

### V. Conclusion

The ALJ erred by failing to adequately address the opinions of Janet Duba, RN, APRN, in her Medical Source Statement-Mental. The matter will be remanded to the Commissioner to allow the ALJ to correct this error. Accordingly,

IT IS ORDERED that judgment shall be entered by separate document, providing that the decision of the Commissioner is reversed and the cause remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

April 22, 2010.                         BY THE COURT:

                                        *Richard G. Kopf*
                                        United States District Judge

---

[10] This determination by the ALJ represents a departure from the opinions of Dr. Smith and Dr. Schmechel, who found that Evans has only "mild" limitations in this area. (Tr. 149, 175)

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.